UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| V.                        ) | No. 05-CR-10006 JLT |
| ) | |
| ) | |
| DAVID SAMUEL TORRES       ) | |

## SENTENCING MEMORANDUM OF THE DEFENDANT

### This Case

On December 6, 2005, the defendant plead guilty to three counts of threats by means of a threatening communication pursuant to 18 USC § 875( c ). The offense arose when the defendant broke up with his girlfriend, Lindsay Chong, after a visit to her at Tufts University. The defendant attempted to contact Ms. Chong to request the return of some of his personal property, in particular items of clothing and money he believed that she owed him. Ms. Chong did not respond, and in increasing frustration, the defendant called her many times and emailed her repeatedly. Ms. Chong changed her telephone numbers and blocked the defendant from her email. When a friend tried to intercede, the defendant began to call her many times as well. Eventually, Ms. Chong's friend reported the calls to the security department at the university.

The FBI was contacted and at their request, Ms. Chong removed the block from her computer and returned the defendant's name to her list of "buddies" from whom she

could receive instant messages. [1] The defendant then sent her a single instant message session in which he repeated threats that used raw and vile language. There is no excuse for the defendant's behavior and he is deeply ashamed of his conduct. He certainly never intended to harm Ms. Lindsay and did not seriously mean the threats he sent. He reacted to her refusal to discuss his personal items as a rebuke to him. He felt that she not only had no use for him but that even his personal items were beneath her notice.

A review of the defendant's history and background might shed some light on the circumstances surrounding this case. This history is offered not as an excuse, but as perhaps an explanation of how this occurred and why it appears highly unlikely that such behavior would ever occur again.

### The Defendant's background

David Torres is a twenty five year old of Cuban heritage. He was born in Miami and has lived there all of his life with his family. His parents were born in Cuba and settled in Miami. He has a sister Rachel, age 21 and a brother Marcus, age 18. All of the children live at home. The family is a close knit one and supportive of David. They are a hard working family with his mother employed as a nurse and his father as an insurance salesman. David has worked since he was sixteen years old, holding jobs while attending high school and college.

David was a sheltered and immature young man when these events occurred. David's life has been relatively smooth with a protective immediate and extended family. He graduated from high school and began college at Florida International University. He worked at department stores while attending school, initially acting as perfume sprayer

---

[1] A buddy list is a list of people who are notified if the user is on line. They may interrupt the user and notify him or her that they too are on line and wish to communicate.

and working his way up to salesman. He lived at home, worked, spent time with his family and friends and spent a fair amount of time going to clubs with friends in Miami.

In 2002, David went on vacation in Colorado and broke his wrist in a snowboarding accident. The break was a bad one, requiring surgery and the placement of rods and plates. As a result of the injury and recuperation from the surgery, David lost his job, couldn't keep up with his course work and lost his scholarship. For the first time in his life, David found life difficult. He rebounded, however, and went back to work as soon as his injury healed.

David takes his work seriously and advanced from perfume sprayer to salesman to account representative. He is proud of the work he does and is ambitious to succeed. He dresses well, purchasing designer clothing, which is important to his work and to his his image of himself.

David's involvement in this case began when he met Lindsay Chong at a dance club in Miami in the spring/summer of 2002. They were very quickly physically intimate but did not in fact, know each other very well. To some degree the match seems to be an odd one; David was a perfume sprayer in a department store and Lindsay was a young women headed to a prestigious New England university.

In the fall of 2002, their relationship dwindled when Lindsay left for college. In the summer of 2003, David and Lindsay met again at a club and resumed their relationship. This continued through 2003 and into 2004. In the fall of 2004, David came to Tufts to visit Lindsay. She paid for his airline ticket. He stayed with her and they resumed their sexual relationship. Although Lindsay now states that the relationship was over at that time, it is not clear that she was forthright with David. As with many young

people, physical intimacy seemed easier than emotional intimacy or even clear communication.

The visit ended on a sour note when Lindsay took a telephone call from her ex-boyfriend. The caller identification on her telephone revealed the name and David was hurt and upset that Lindsay chose to speak with her ex-boyfriend while David was present. David felt this showed her contempt for him. David, as he indicated to his therapist, is from a loud and noisy family. When an argument occurs, it is vocal and loud. David reacted to Lindsay's behavior in a manner entirely typical for his family. He was loud and emotional. This clearly made Lindsay uncomfortable and the relationship ended badly and abruptly that day.

After David returned home, he called Lindsay about some items he had left behind, including some clothing. David had packed his best clothing to see Lindsay and did not earn enough money to forgo what he left behind. Lindsay chose not to respond to him and that unfortunately, set off persistent and obnoxious efforts by David to reach her, in multiple telephone calls, emails and instant messages.

There is no question that David's behavior was unacceptable. The language that he used was raw and filled with violent images. While this is not meant to excuse his actions, the fact is that such images and language are the norm in the music and videos that David and his generation listen to and watch.[2]

---

[2] In an internet search of song lyrics on lyrics.astraweb.com, the word "bitch" resulted in 354 songs that either had the word in the title, album or recording artist. The use of the word "hoe" (short for whore, another unfortunate reference to women) resulted in 74 songs that either had the word in the title, album or recording artist. In 2005, an Academy Award was given for the rap song "Its Hard Out Here for a Pimp".

David was arrested in Miami in December, 2004. He was immediately cooperative and confessed to sending the messages. He told the FBI that he never meant the things he said and he never intended to hurt Lindsay.

David was released from custody in Boston and allowed to return home on an electronic bracelet with random urine screens. He complied with all requests by his pretrial services supervisor, Jose Blanco. He passed all urine screens. At Mr. Blanco's request, counsel was able to remove the condition of an electronic bracelet and the random urine screens.

At the request of his counsel, David obtained a therapist upon his return to Miami. He talked with her at length about his situation and obtained some insight about his behavior. David is not a complicated young man. He enjoys his life and his work. He is currently involved in a relationship with a young woman and made her available to be interviewed by P.O. Smith. An evaluation of David by Dr. Helene Presskreicher concluded that he was highly motivate to stay out of trouble and had learned from his mistakes. He does not suffer from deep rooted problems such that the Court would fear his ability to control his behavior.

As a result of these events, David risks the loss of his freedom and at the very least a felony conviction for a federal crime. He cannot vote in Florida and applications for jobs will likely require him to disclose this conviction. His future is certainly in doubt in a way that it had never been before.

## The Guidelines

The pre-sentence investigation provides for two additional points for two or more threats. The defendant's objection to this enhancement is described in the addendum to the probation report.

It is clear that the threats made by the defendant on that day were in a single instant message. Instant messaging is a form of communication over the internet which is in "real time", the same as if it were a single telephone call. ("Instant messaging is the act of instantly communicating between two or more people over a network such as the Internet." Wikipedia, Internet Encyclopedia) .The guideline enhancement calls for an enhancement if the offense involved more than two threats. The offense in question here was a single communication.

The federal circuits which have reviewed this enhancement are unanimous in deciding that the number of threats refers to the number of communications and not the number of threats within a single communication. In United States v. Stokes, 347 F.3d 103 (W. Va. 2003), the Fourth Circuit held that a threat made by the defendant to his wife, the man or men he believed she was having an affair with and his three children was a single threatening communication and reversed the application of the enhancement. The Court stated:

> In sum, Note 3(B) clarifies that the phrase "more than two threats," as used in § 2A6.1(b)(2), refers to the number of threatening communications, not the number of victims threatened. Thus, the district court erred in imposing a § 2A6.1(b)(2) enhancement.

Id. at 106.

In United States v. Frazer, 391 F.3d 866 (7th Cir. 2004), the Seventh Circuit upheld an enhancement for multiple threats where the defendant recorded a bomb threat

and played it to school officials in three separate telephone calls. The Court held that the number of threatening communications controlled the application of the enhancement as follows:

> But more importantly, existing authority associates the number of threats for purposes of § 2A6.1(b)(2) with the number of communications made. ...Under these statutes, the unit of prosecution is the telephone call or letter; each call or letter is indictable separately as a different "threat." See *United States v. Corum*, 362 F.3d 489 (8th Cir.2004) (three counts for three telephoned bomb threats under § 844(e)); *United States v. Nedd*, 262 F.3d 85, 88 (1st Cir.2001) ("four counts of interstate threats" based on four violent telephone messages under § 875(c)); *United States v. Thomas*, 155 F.3d 833 (7th Cir.1998) (counting five letters as "five death threats" under § 876). We ourselves have assumed that "threats" and "threatening communications" have the same meaning. See *United States v. Bohanon*, 290 F.3d 869, 876 (7th Cir.2002). See also *United States v. Goynes*, 175 F.3d 350, 355 (5th Cir.1999) (equating "multiple threatening letters" with "multiple threats" in applying § 2A6.1(b)(2)); *United States v. Newell*, 309 F.3d 396, 403 (6th Cir.2002) (assuming that "the Sentencing Commission accounted for the number of communications by imposing an enhancement under U.S.S.G. § 2A6.1(b)(2)"). And one of our sister circuits has explicitly defined "threats" as "threatening communications" for purposes of § 2A6.1(b)(2). See *United States v. Stokes*, 347 F.3d 103, 106 (4th Cir.2003) (holding that "the phrase 'more than two threats,' as used in § 2A6.1(b)(2), refers to the number of threatening communications").

Id. at 870. As such, the two point enhancement should not apply. As such, the defendant's total offense level should be 12 not 14.

The defendant accepted responsibility and 2 points should be deducted from this number. As such, the defendant's guideline number is 10. With a criminal history of 10, the guidelines provide that the defendant may be sentenced between 6 and 12 months and is within Zone B. As noted in the pre-sentence report, the defendant is a candidate for home detention and electronic monitoring. The defendant requests that this Honorable Court sentence him to a term of probation without electronic monitoring. It is clear from

the defendant's supervision by pre-trial services that he has the ability to complete such supervision without incident.

The defendant believes that there are additional mitigating factors or factors that may warrant departure when considered in combination under <u>Koon v. United States</u>, 518 U.S. 81 (1996).

The defendant has shown extraordinary recognition of his responsibility since his arrest which should be taken into account as a mitigating factor. The defendant was placed on pretrial release with an electronic bracelet and conditions of random drug testing and allowed to return home to Miami. He had an electronic bracelet and had frequent reporting requirements to his pre-release officer Jose Blanco. Mr. Torres was compliant in every respect with his pre-release, such that Mr. Blanco requested that the electronic bracelet be removed as well as the requirement for random drug testing. Mr. Torres remained gainfully employed and lived at home with his parents. They are supportive of him. He attended weekly therapy with a social worker who has worked extensively in the area of domestic violence. He gained some insight into his behavior and is deeply shameful of his actions. He comes from a family of Cuban immigrants who pride themselves in their assimilation and lawful conduct. He is in a steady and positive relationship with a young woman. He has matured a great deal in the last year and a half. As the pre-sentence report noted, an evaluation of Mr. Torres by Dr. Helene Presskreicher concludes that he is highly motivated to avoid any further contact with the criminal justice system. (See attached report).

A second factor is the nature of the crime itself. While the defendant does not minimize his conduct, the reality is that this case is of a sort that is typically dealt with in

a state district court, not a federal court. This is a case that would most likely have resulted in a continuance without a finding, given the defendant's lack of criminal record and his willingness to comply with conditions set by the court. The goal of the sentencing guidelines is "to reduce unjustified disparities and so reach towards the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice", Koon v. United States, supra at 113 (1996). It seems to be an odd type of justice where the results are dictated by the geography of the courts.

As the Court well knows, the sentencing guidelines are no longer mandatory but advisory after Booker, 125 S. Ct. 738 (2005). The "guidelines are still generalizations that can point to outcomes that may appear unreasonable to sentencing judges in particular cases." Commonwealth v. Jiminez-Beltre, 440 F.3d 514 (1st Cir. 2006). A review of the sentencing factors under 18 USC 3553 require that the Court impose a sentence sufficient, but not greater than necessary to comply with the purposes established by Congress, after considering the nature and circumstances of the offense and the history and characteristics of the defendant. The nature and circumstances of the offense and the history and characteristics of the defendant indicate a young man who was desperately immature and has learned from his mistakes. It is clear that he was deeply annoying to Ms. Chong, but she did not seek criminal prosecution. The instant messaging which contained the threats in question occurred after Ms. Chong unblocked the defendant's inability to contact her.

A sentence of probation in this case would meet the need for such a sentence as listed in paragraph 2 of 18 USC 3553 in that the Court would consider the need: (A) to reflect the seriousness of the offense, promote respect for the law, and provide just

punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A sentence of probation would reflect the seriousness of the offense. The defendant has already come to realize how serious his behavior was and has been respectful of every condition placed upon him by the Court. The period of time in which he has been released demonstrates that supervision has been an adequate deterrence to any further criminal conduct by the defendant to Ms. Chong or the public. The pre-sentence report indicates that the defendant must attend a domestic violence program if readily available in his community. This too will serve to reinforce the defendant's determination to avoid such behavior in the future.

The Court is also required to examine the kind of sentences available as well as the sentences available under the guidelines. As indicated by the pre-sentence report, the kind of sentences available includes home confinement with an electronic bracelet. There is little real difference between home confinement which would allow the defendant to be released for work and a sentence of probation. The defendant has shown that he can behave in a lawful manner without the need for a bracelet, continuing to work and live with his family. The bracelet is simply no longer necessary.

## Conclusion

The defendant is a young man who made a serious error in judgment. He did not mean to scare his former girlfriend and he never intended to carry out the threats he sent. He has from his arrest, complied with all of the courts' orders as well as additional

requests made of him by counsel. He has continued to lead a productive life, working and living at home with his parents. He is deeply ashamed of his conduct and is gravely concerned that he faces the rest of his life with a criminal record. A sentence of probation is more than sufficient to meet all of the needs and purposes of sentencing for this crime.

          Respectfully Submitted
          David Samuel Torres
          By his attorney:

          /s/Janice Bassil
          BB0 #033100
          Carney & Bassil
          20 Park Plaza, Suite 1405
          Boston, Ma. 02116
          (617) 338-5566

July 7, 2006