UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA   )
                                   )
                                   )
V.                                )     No. 05-CR-10006 JLT
                                 )
                                 )
DAVID SAMUEL TORRES     )

## **SUPPLEMENTAL SENTENCING MEMORANDUM**

The defendant hereby incorporates the attached Report of Dr. Helene

Presskreischer to the previously filed Sentencing Memorandum.

Respectfully Submitted
David Samuel Torres
By his attorney:

/s/Janice Bassil

Janice Bassil
BB0 #033100
Carney & Bassil
20 Park Plaza, Suite 1405
Boston, Ma. 02116
(617) 338-5566

July 11, 2006

1

# HELENE PRESSKREISCHER, PSY.D.

Tel (781) 673-2547
Fax (781) 455-9915

**Forensic Consultation & Assessment Services**
A Professional Association
P.O. Box 620154
Newton, MA 02462

March 1, 2006

Janice Bassil, Esq.
Carney & Bassil
20 Park Plaza
Suite 1405
Boston, MA 02116

Re: U.S. v David Samuel Torres
    CR. NO. 05-10006JLT

Dear Ms. Bassil,

I have completed the psychological evaluation of your client, Mr. David Torres, who is charged in the U. S. District Court with three counts of Threats by Means of Interstate Communication. In conducting this evaluation I have relied upon data gathered from the following:

1. Interview with Mr. Torres on Feb. 1, 2006 totaling approximately 2 ¾ hours.
2. Federal Bureau of Investigation Reports dated 12/15/04, 12/20/04, 12/28/04, 1/3/05, and 1/4/05.
3. Affidavit of FBI Special Agent Robert Rice dated 12/15/04.
4. Miami-Dade Police Department Offense-Incident Report dated 3/20/04.
5. Tufts University Department of Public Safety Case Reports dated 11/17/04 and 12/6/04.
6. Instant messages dated 12/5/04, 12/6/04 and 12/10/04.
7. Printout of telephone messages dated 11/24 [2004].
8. Copy of the Grand Jury Indictment dated Jan. 12, 2005.
9. Outpatient medical records and laboratory results from the office of Dr. Guillermo Font covering the period from 4/2/93 through 6/17/04
10. Letter of reference for employment written by Guillermo Font, M.D. dated 5/22/97.
11. Christopher Columbus High School Transcript.
12. Letter from Maria Elena Fernandez, LCSW dated 7/12/05.
13. *Curriculum vitae* of Ms. Maria Elena Fernandez.
14. Telephone contact with Ms. Maria Elena Fernandez, LCSW, on 2/15/06.
15. Telephone contact with Ms. Lidia Torres on 2/10/06.

<u>Background Information</u>: Mr. Torres was born in Miami, Florida on March 30, 1981. He is the oldest child of Lidia and Frank Torres who both immigrated to the United States from Cuba. Mr. Torres has a sister, Rachel, who is twenty-one and a brother, Marcus, who is seventeen.

Mr. Torres was raised in Florida in a stable, middle-class family. His mother is a nurse and his father is an insurance salesman. Mr. Torres denied any family history of psychiatric illness or substance abuse and denied that he had ever been physically or sexually abused. Mr. Torres additionally denied witnessing any physical aggression between his parents. "We were a normal Cuban family. We all would argue and get loud but there was nothing physical, only verbal."

Mr. Torres performed well in school from the elementary years through high school. He obtained good grades, was socially active, and participated in several sports. At Christopher Columbus High School he maintained a B average in Honors level classes, was on the varsity basketball and track teams, and ultimately earned an academic scholarship to Florida International University (FIU). At no time was Mr. Torres the subject of disciplinary actions and he was never suspended or expelled from school.

Mr. Torres' first significant romantic relationship occurred during his high school years. He met a young woman named Crystal when he was seventeen and she was sixteen. They dated for approximately eighteen months. "She was an American girl and she lived in Pembroke Pines. It was a good relationship but she lived too far away and the distance was just too far." Mr. Torres said that the decision to end the relationship was "mutual" and was accomplished "with no problems." He denied that he had ever been aggressive toward Crystal at any point in their relationship.

Mr. Torres enrolled at FIU in the fall of 1999 intending to major in communications. He said, however, "It was a mistake. I should've gone to community college first." Mr. Torres explained that he had begun working part-time at the age of sixteen "selling fragrances in a mall for Tommy Hilfiger and Calvin Klein." He was "always good at sales" and worked consistently during both the school year and the summer months. When he began college, "I was working 25 to 30 hours a week at a shoe store, and with my dad, but then I was hired as an account coordinator for Calvin Klein. I was in charge of the whole line of twelve fragrances for one store and I even had people working for me. It was 40 to 50 hours a week." Although Mr. Torres enjoyed the job, the demanding work schedule interfered significantly with his academic life.

Mr. Torres nonetheless managed to complete the first semester and start the second but in January of 2000 he broke his right arm while snowboarding in Breckenridge, Colorado. "I broke the radius and they had to put a plate in my right arm and some screws. I was in rehab for eight months and I lost my job and my scholarship. It was a really hard time." He spent his days recovering at home and "in the fall I started working some again with my dad." By Christmas of 2000, Mr. Torres had returned to the fragrance industry (selling perfume for Givenchy) and he continues to be employed by Givenchy, currently as an account coordinator at a Macy's department store in downtown Miami.

Mr. Torres' second significant relationship began shortly after his relationship with Crystal ended. He was approximately 18 ½ when he met, "Daniela who was from Ecuador. She was seventeen. Everything went great until things just fizzled out. There's no way to really explain it." Mr. Torres said that they dated for approximately 18 months "but I'm still friends with her." He denied that he had ever been aggressive toward Daniela and further denied that there were any problems at the time of the break-up.

When asked about his history of alcohol and drug use, Mr. Torres said that he had his first drink of alcohol while he was in high school. "I was never a regular drinker but we would get wasted for big occasions like homecoming or prom." After graduation, "I stopped getting wasted. The most I'll have now is a beer or two." Mr. Torres smoked marijuana in high school "once in a blue moon" and tried Ecstasy "once for my eighteenth birthday" but he adamantly denied ever smoking marijuana on a regular basis, trying cocaine, or selling drugs (as alleged by Ms. Chong in her report to the FBI).

Mr. Torres reported that he was arrested on only one occasion prior to the instant alleged offenses. He estimated that it was approximately three year ago "when we were at a Tiki Bar on Key West. I was walking on a sandbar and I lost track of my friends. Then these strangers started throwing things at me and I jumped into the ocean and started swimming." Shortly thereafter he saw someone he knew in a boat. "He told me to jump in and he took me back to a different dock. When we got in [to the dock] there were two cops there. I tried to tell them that I'd been rushed [attacked] but they just said, 'Have you been drinking?' and I was, so they put me under arrest for trespassing." Mr. Torres could not recall the disposition of the charge but said, "I had to report to someone two times and I think that was it."

<u>Mr. Torres' Account of his Relationship with Ms. Chong</u>: Mr. Torres said that he met Ms. Chong at a club in the spring of 2002 when he was nearly twenty and she was eighteen. They became sexually involved almost immediately but Mr. Torres clarified that they were not dating. "She was all over me…and that whole summer she was crazy about me but I told her I didn't want to be her boyfriend."

In the fall of 2002, Ms. Chong moved to Massachusetts to begin her freshman year at Tufts University. "She would call me every day but I still didn't want to go out with her. I didn't like how she slept with me right away and I thought 'Why wouldn't she do that when she's up there?' Lo and behold, that's what she did." Mr. Torres explained, "Around Christmas, my friend Paul Bravo told me that one of his friends was sleeping with Lindsay." Although Mr. Torres initially professed that he "didn't care," he later admitted that he thought her behavior made him "look bad." In response, he telephoned Ms. Chong's family and left a message for them about her sexual activity. "I thought I'd make problems for her."

Mr. Torres said that he had no further contact with Ms. Chong until July 4, 2003. "I was with my friends at a festival in Miami. I was there with a girl and Lindsay was there. I

3

saw her looking at me and following me around. I talked to her and she said, 'I'm so sorry. Please call me. I didn't think you wanted me.'"

Mr. Torres said that his friends advised him not to contact Lindsay, "but I called her anyway and she said that she was 'lost' after we stopped seeing each other and she went to see a therapist. She said she was all messed up because of me." Mr. Torres said that they began "talking again and then we started going out and sleeping together." This time, Mr. Torres was "happy with her" and he felt they were in a real relationship. "I really wanted things to work out."

Ms. Chong returned to Tufts in the fall of 2003 "and she was constantly calling me. It was kinda' like she was obsessed but things were still fine. She even paid for a ticket for me to visit her at Tufts in November. I was there for about a week." Mr. Torres said that the visit went well and they continued their contact through the remainder of the school year with Ms. Chong "calling and calling me all the time."

In the summer of 2004, "she came home and I was at her house daily. I didn't want to see her parents [because of his discomfort about the phone message he had left them a year and a half earlier] but she insisted. I was very courteous and respectful to them and they never brought it up. I never even found out if they told Lindsay but I assume she knew." Mr. Torres said that things continued to go well between them until the end of August.

"It was about two weeks after her birthday. We had a stupid fight and I was really mad. The next morning I woke up and I went to her job and we started arguing. I was really loud and I grabbed her by the arm and her boss said she was going to call security. Security came and told me to leave and I did, but when I called the store later Lindsay told me that her boss had also called the cops." Mr. Torres said that he had no intention of harming Ms. Chong at the time of the incident and had grabbed her arm only as a way to focus her attention. Mr. Torres said that he could not even recall the substance of the argument that had precipitated the incident.

After leaving Ms. Chong's place of employment, Mr. Torres went to work. In the evening, however, he went to Ms. Chong's home. "Her dad came to the front door with their dog looking like he was going to attack me. I said, 'Sir, I didn't mean for anything to get out of hand.' but he wouldn't let me see Lindsay. I was mad at the time but I just left." The following morning, Mr. Torres went back to Ms. Chong's workplace. "I brought flowers and I told her I was sorry. After that we started talking on the phone and little by little we were getting back together but her parents didn't know. Then she went back to school and that was the start of everything."

Official Account of the Alleged Offenses: Ms. Chong told the FBI that she and Mr. Torres had been dating intermittently from the summer of 2002 until the end of their relationship in April of 2004. She alleged that Mr. Torres had been verbally abusive toward her during those years and had shaken her violently on a number of occasions. Nevertheless, she said that they "maintained contact" after the breakup and during the

summer of 2004, they were "intimate on multiple occasions" although "they did not renew their relationship."

Ms. Chong reported that Mr. Torres visited her at Tufts in late October of 2004. She believed that he was coming to repay her for items that she had purchased while they were dating and she hoped that she might also "gain closure" on their relationship. During the visit, Mr. Torres allegedly sought to renew their relationship and when Ms. Chong refused, he became angry and verbally abusive. On the day Mr. Torres was scheduled to leave (Nov. 2, 2004) he insisted that Ms. Chong accompany him to the airport. When she declined, they began screaming at one another and Mr. Torres reportedly threw a chair against the wall of her dorm room. Ms. Chong eventually agreed to go but Mr. Torres later attempted to prevent her from leaving the airport by blocking her access to the train.

Over the next six weeks, Ms. Chong allegedly received a multitude of telephone calls and Instant Messages from Mr. Torres, many of which were both obscene and threatening. In some of the communications Mr. Torres also requested that Ms. Chong return money and personal items that he claimed were still in her possession. Mr. Torres additionally made numerous harassing telephone calls to Ms. Chong's family, friends, and co-workers.

On Dec. 16, 2004 Mr. Torres was arrested for the instant alleged offenses. Ms. Chong reportedly received only one communication from Mr. Torres subsequent to that date. On Jan. 6, 2005, Mr. Torres allegedly sent an Instant Message to Ms. Chong apologizing for the trouble he had caused her and asking her to drop the charges against him. Of note, is that Ms. Chong also told the FBI that Mr. Torres had never been in possession of a weapon.

Mr. Torres' Statements to the FBI on Dec. 16, 2004: Mr. Torres reported that he and Ms. Chong had been dating "on an off" since the summer of 2002. In contrast to Ms. Chong's report, however, he did not indicate that the relationship had ended in the spring of 2004.

Mr. Torres said that he traveled to Massachusetts in November of 2004, "to visit...and settle issues with their relationship." He noted that he and Ms. Chong were sexually intimate during the trip but on the last day of his visit an ex-boyfriend called and Mr. Torres became angry.

Mr. Torres said that a friend of Ms. Chong's (Ms. Xylas) contacted him a week after his return to Miami and indicated that she was calling on Ms. Chong's behalf. Mr. Torres then began relaying messages to Ms. Chong through Ms. Xylas and the alleged offenses occurred subsequently. Mr. Torres did not deny sending communications to Ms. Chong that were "not nice stuff" but said that he "never meant any of the things he said..." Mr. Torres also denied that he had ever physically hurt Ms. Chong although he acknowledged that they had had many arguments.

Mr. Torres' Account of the Alleged Offenses During the Evaluation: Mr. Torres said that he was "still really into" Ms. Chong when she returned to Tufts in the fall of 2004, "and I

thought she was into me. I would IM her, we talked on the phone, and she gave me her address for letters." In October of 2004 he received an IM from Ms. Chong saying, "I miss you so much. I want to be with you. I want to marry you." and she asked him to visit her in Massachusetts.

Mr. Torres readily agreed and he arrived at Tufts at the end of October. "We slept together that first day. I was thinking we were resuming our relationship [after the tension that had existed following the incident in August] and I asked her if she wanted to be with me. She said, 'Yes. I'll give you another chance.'" but Mr. Torres said that if Ms. Chong had preferred to be "just friends" he would have accepted her decision.

Mr. Torres said that he and Ms. Chong had sex on three occasions during the three days he was in Massachusetts. On the last day of the visit, however, Ms. Chong told him, "'Let's just be friends.' I got kinda' pissed and I said, 'Why did you sleep with me? Why was I spending money on you?' I got loud and I grabbed my bag and left. She came with me to the airport and we were both crying there. It was weird and horrible."

After he returned to Florida, Mr. Torres received a phone call from Ms. Xylas and "a text message and an IM" from Ms. Chong. He remained in contact with Ms. Chong for the next few weeks although it was clear that they would not be resuming their relationship. Mr. Torres explained that he had left "two jerseys and two Armani Exchange shirts" in Ms. Chong's dorm room and said that Ms. Chong also owed him $200. He had repeatedly requested that she return these items to him but Ms. Chong was unresponsive.

Mr. Torres became increasingly frustrated by the situation and told Ms. Chong that if she did not return his personal effects he would contact her father and reveal that they had been seeing each other "behind his back." By the beginning of December "there was still no stuff and I did call her dad and I told him about the whole relationship. Right after that was when all the email started."

Mr. Torres explained that he was "really pissed. I wasn't thinking and it was childish and stupid. I was just trying to scare her to get my stuff back. I was trying to put fear into her to get the stuff quicker but there was just dead silence from her. I started getting crazy because of it."

Mr. Torres was adamant that he never intended to harm Ms. Chong. He was also unaware that his behavior could be construed as a criminal act. "I'll tell you the truth. I didn't even know it was wrong. I thought that it was freedom of speech and I never thought she would call the police. I was just typing my feelings and it was kind of like a fight to see who could win between me and her."

Mr. Torres said that he knew that the frequency and intensity of his communications to Ms. Chong "makes it look like I was obsessed with her but that wasn't the point. I didn't want a relationship with her then, or even a friendship. I just wanted my stuff." Mr. Torres also insisted that the calls he made to other individuals were not designed to be

6

deliberately harassing. Rather, they reflected his frustration about being unable to communicate with Ms. Chong directly to obtain his belongings.

I asked Mr. Torres about some of the other information contained in the FBI reports. He vehemently denied ever having been physically aggressive toward Ms. Chong during the course of their relationship, except for the incident in which he grabbed her arm at work. He denied throwing a chair in Ms. Chong's dorm room, he denied insisting that she accompany him to the airport, and he denied attempting to prevent her from boarding a train. He did, however, acknowledge that an ex-boyfriend had called Ms. Chong on the last day of his visit and that this had upset him. "She picked up the phone right in front of me. She has caller i.d. so she knew who it was and I thought, 'What the hell is this?'"

Mr. Torres also admitted that he contacted Ms. Chong in January of 2006 to apologize for his behavior and to request that she drop the charges. He never again attempted to communicate with her, however, and indicated that he had no intention of doing so in the future. "I have no feelings for her now and I'm not gonna' worry about getting my stuff back." When asked why he believed he reacted so strongly to the termination of his relationship with Ms. Chong, Mr. Torres responded, "It was more like a fight. Who's gonna' be on top. It was just plain stupid."

Mr. Torres was held in a federal prison in Miami for several days after his arrest. Following his release from custody he was placed on a program of home confinement and was required to work, meet regularly with a probation officer, and submit to periodic drug testing. Mr. Torres said that he has been compliant with all aspects of this program and has never had a "dirty urine." He additionally noted that he has not been arrested or charged with any new offenses in the past fourteen months.

Collateral Data: Ms. Lidia Torres, Mr. Torres' mother, confirmed the history that her son provided during the interview. She emphasized that he had never had problems of any kind prior to the alleged offenses (other than his arrest for trespassing several years ago) and denied that there was any history of domestic violence within the family. She also denied that her son had ever possessed weapons, engaged in violent behavior, or experienced difficulties in prior romantic relationships. Ms. Torres was particularly upset about the allegations that her son had used and sold drugs. She noted that Mr. Torres has lived at home all his life and there was nothing about his behavior that would support this claim.

With regard to the alleged offenses, Ms. Torres said that she believed her son was "pretty much in love" with Ms. Chong during the course of their relationship but the anger he displayed at the end "was all about his things, having to get his things back. It was like he was a little obsessed. My mother and I told him to leave it alone but he said she was telling him she would give the things back and he wouldn't let it go." Ms. Torres said that her son never expressed (to his family) any desire to harm Ms. Chong and she could not imagine that he would ever do so. She additionally noted that he had no interest in resuming any type of relationship with Ms. Chong at this time.

7

In the spring of 2005, Mr. Torres engaged in a brief course of outpatient therapy with Ms. Maria Fernandez, a social worker who specializes in domestic violence. In a letter to Mr. Torres' attorney dated July 12, 2005, she noted that Mr. Torres told her "the incident for which he was arrested has changed his life, causing him to feel frustrated and powerless. He insisted that he was sorry for what he did…'I felt so frustrated and angry because she did not return my stuff that I wanted to bother her until she did, but I did not mean what I said.'"

Ms. Fernandez additionally indicated:
> "…he seems to believe he has been punished much harder than he deserved, failing to realize the consequence of his abusive behaviors on others, as well as failing to take responsibility for the severity and frequency of his abusive patterns…This pattern of obsessive behavior is commonly observed in batterers as well as the externalization of blame to justify their abuse. However at this time it is not believe [sic] that Mr. Torres represents a high risk to society. He seemed to have learned significantly about the legal consequences of abuse, from the arrest and being placed on house confinement."

During my telephone conversation with Ms. Fernandez, she stated that Mr. Torres denied any history of harassment (or violence) in his previous romantic relationships and denied that he had ever behaved aggressively toward Ms. Chong. It was her opinion, however, that Mr. Torres exhibited "a pattern of possessiveness" in his relationship with Ms. Chong that was "exacerbated by the break-up" and ultimately led to the alleged offenses.

Clinical Observations: Mr. Torres is a short, slim, dark-haired male who spoke with a slight Spanish accent. His appearance was noteworthy in that he was stylishly dressed, immaculately groomed, and sported a diamond stud in one ear.

Mr. Torres was alert, oriented and cooperative throughout our meeting and there was no evidence of a formal disorder of thought, a significant disturbance in mood, or perceptual abnormalities in any modality. He appeared to be of at least average intelligence and exhibited no deficits in his cognitive functioning. Mr. Torres denied any history of symptoms of psychosis, depression or mania, and suicidal and homicidal ideation were denied currently and by history.

Mr. Torres did, however, express considerable frustration about his legal situation. He noted that after he apologized to Ms. Chong in January of 2005, "She responded that my apology was accepted and I thought that would be it." He said he "knew he was to blame" but felt that he had been "punished severely" during the past fourteen months and hoped that the court would consider this when determining a final disposition.

Discussion: Mr. Torres is a twenty-four year old male who was raised in Miami, Florida in a stable home environment. Throughout the years he has performed well academically, athletically, socially and occupationally and there is no evidence that he has ever suffered from a psychiatric illness or a substance abuse disorder.

8

Of particular note is that Mr. Torres has no known history of aggressive or antisocial behavior. He has never been part of a violent subculture, he has never owned or carried weapons, he has never been charged with a violent offense and his criminal record contains only one prior arrest – for trespassing.

With regard to the instant alleged offenses, Mr. Torres fully acknowledges that he engaged in a pattern of inappropriate behavior. He admits that he was angry with Ms. Chong and that his communications were designed, in part, to frighten her into returning his belongings. He insists, however, that he would never have harmed Ms. Chong and there are a number of factors that lend support to this assertion.

First, as mentioned above, is that Mr. Torres has no known history of aggressive behavior. Particularly noteworthy in this regard, is that Mr. Torres has reportedly been involved in two previous romantic relationships and there have been no allegations of harassment or violence in either of them. Second, although Mr. Torres' communications to Ms. Chong included threats to her safety, he never made any efforts to find her despite the fact that she would not have been difficult to locate. Third, Mr. Torres' messages to Ms. Chong ceased immediately upon his arrest and he did not make any threatening statements to, or about, Ms. Chong in the subsequent fourteen months. Fourth, it is not at all clear that Mr. Torres ever behaved aggressively toward Ms. Chong during the course of their relationship (apart from the incident in which he grabbed her arm). Although Ms. Chong alleges that he shook her violently on several occasions, Mr. Torres denies having done so and there is no additional data available to corroborate her account.

Finally, I would note that Mr. Torres appears highly motivated to avoid any further contact with the criminal justice system. Given that he now understands clearly the legal consequences of threatening behavior this should serve as a powerful reminder for him to avoid any such behavior in the future.

If I can be of any further assistance in this matter, please do not hesitate to contact me.

Sincerely,

Helene Presskreischer, Psy.D.

9

# HELENE PRESSKREISCHER

P.O. Box 620154
Newton, MA 02462
(781) 673-2547

## EDUCATION

| 1985 | Psy.D. | University of Denver | Denver, CO |
|------|--------|----------------------|------------|
|      |        | School of Professional Psychology | |

| 1978 | B.A. | Swarthmore College | Swarthmore, |
|------|------|--------------------|-------------|
|      |      | PA | |
|      |      | Psychology | |

## CLINICAL EXPERIENCE

10/94 – Present    **Independent Practitioner, Forensic Consultation & Assessment Services,** Newton, MA
Evaluations of adults involved in the criminal justice system including competence to waive Miranda rights, competence to stand trial, criminal responsibility, diminished capacity, aid in sentencing, and recommendations for probation/parole. Additionally, assessments of violence potential related to civil commitment, need for strict security, and privileging and release decisions for hospitalized psychiatric patients.

12/95 – Present    **Forensic Psychologist, Roxbury/West Roxbury District Courts**
Roxbury/West Roxbury, MA (Half-time position)
Screening examinations of criminal defendants with suspected mental disorders and assessment of individuals facing emergency civil commitment (psychiatric/substance abuse). Supervision of psychiatrists and psychologists training to become Designated Forensic Professionals and consultation to Dept. of Mental Health inpatient facilities regarding privileging and discharge of forensic patients.

9/88 – 11/95    **Senior Supervising Psychologist, Bridgewater State Hospital**
Bridgewater, MA (Three days per week)
Clinical supervisor and consultant at Massachusetts' most secure psychiatric hospital for adult males. Areas of supervision included diagnosis of mental illness, assessment of violence potential, need for hospitalization and strict security, and case management.

Conducted court-ordered examinations of competence to stand trial, criminal responsibility, aid in sentencing, disposition of individuals found incompetent to stand trial or not guilty by reason of mental illness, and disposition of pre-trial and convicted inmates with mental disorders. Forensic Mental Health Supervisor for psychiatrists and psychologists seeking Designated Forensic Professional certification from the Dept. of Mental Health.

| | |
|---|---|
| 7/86 – 9/88 | **Unit Director, Bridgewater State Hospital,** Bridgewater, MA<br>Clinical director of a 59-bed unit. Administratively responsible for organizing treatment planning conferences and case reviews, delegating assignments to clinical staff and overseeing continuity of patient care. Clinically responsible for evaluations of patients' need for continued treatment at Bridgewater. Individual, group and family therapy, clinical supervision. Court-ordered examinations as noted above. |
| 11/85 – 7/86 | **Assistant Psychologist, McLean/Bridgewater Program,** Bridgewater, MA<br>Unit psychologist at Bridgewater State Hospital responsible for individual diagnostic evaluations and treatment planning. |
| 1/84 – 11/85 | **Principal Psychologist, Taunton State Hospital/Brockton Area Facility,** Taunton, MA<br>Developed a Department of Psychology in the adult inpatient facility with both administrative and clinical responsibilities. Direct care services included individual and group psychotherapy and psychological testing. Indirect services consisted of ongoing research, supervision of staff and students, treatment planning consultation, in-service education and creation of department policies and procedures. |
| 1982 – 1983 | **Psychology Intern, Denver Department of Health and Hospitals,** Denver, CO (APA approved)<br>Inpatient—Primary therapist for adults admitted to the acute care facility. Responsible for all psychodiagnostic evaluations and several psychiatric emergency room evaluations. Reorganized the group therapy program and co-led group sessions. (Six months)<br>Outpatient—Individual, group, and couples therapist for clients in all age ranges. Responsible for psychological testing of both medical and psychiatric patients and supervision of a graduate-level clinical psychology practicum student. (Six months) |
| 1981 – 1982 | **Clinician Arapahoe Mental Health Center**<br>Littleton CO (Part-time position) |

Staff therapist for individual outpatient treatment of children, adolescents and adults. Also responsible for psychodiagnostic testing and consultation with professional staff and community agencies.

1979 – 1980    **Diagnostic Consultant, National Jewish Hospital/National Asthma Center,** Denver, CO
(Part-time position)
Evaluated adult patients with chronic respiratory illness using a variety of projective, objective, neuropsychological and illness-specific instruments. Provided feedback to patients and consulted with physicians and nursing staff regarding patient management and treatment planning.

## PRESENTATIONS/PUBLICATIONS

Need for Hospitalization and Strict Security Revisited. Co-presenter at the Bridgewater State Hospital Seminar Series. Bridgewater, MA, December 2003.

Assessment of Violence Potential. Presenter at the Quincy Mental Health Center Seminar Series. Quincy, MA, June 2003.

Forensic Clinicians "For the Defense" in Criminal Cases. Panelist at a conference sponsored by the Division of Forensic Mental Health and the Univ. of Mass. Medical Center. Worcester, MA, June 2002.

Ethical Dilemmas in Forensic Work. Co-presenter at the Bridgewater State Hospital Seminar Series. Bridgewater, MA, November 2001.

Personal Safety Issues: Results of a Survey of Massachusetts Designated Forensic Professionals. Presenter at a conference sponsored by the Division of Forensic Mental Health and the Univ. of Mass. Medical Center. Leominster, MA, June 2000.

Mental Health Issues in the Courts. Presenter at the Basic Training Course for New Prosecutors sponsored by the Massachusetts District Attorneys Association. Waltham, MA, January 2000.

Personal Safety Issues: A Survey of Forensic Mental Health Professionals. Presenter at the National Association of State Mental Health Program Directors—Forensic Division Conference. Tarrytown, NY, October 1999.

Personal Safety Issues for Professionals. Panelist at the Northeast Regional Conference of the Association of Family and Conciliation Courts. Boston, MA, September 1996.

Working with the Difficult Client. Panelist at a Massachusetts Continuing Legal

Education seminar sponsored by the Boston Bar Association. Boston, MA, February 1996.

Personal Safety of Forensic Professionals. Presentation at the conference: Foundations for Designated Mental Health Practice in the Commonwealth. Worcester, MA, Annually 1993 – 1999.

Therapeutic Jurisprudence and Civil Commitment. Presenter at a conference co-sponsored by the Division of Forensic Mental Health and the Univ. of Mass. Medical Center. Auburn, MA, May 1992.

Writing Competence to Stand Trial Evaluations. Presentation at a conference sponsored by Bridgewater State Hospital. Bridgewater, MA. January 1991.

Understanding Forensic Evaluations. Presentation at the Whitman Counseling Center Annual Seminar Series. Brockton, MA, April 1990.

Detecting Malingering in Forensic Evaluations: A Review of the Research. Presentation at a conference co-sponsored by the Division of Forensic Mental Health and the Univ. of Mass. Medical Center. Worcester, MA, October 1989.

Haycock, J., Finkelman, D., & Presskreischer, H. (1994). Mediating the gap: Thinking about alternatives to the current practice of civil commitment. New England Journal on Criminal and Civil Confinement, 20, 265–289.

## LICENSING/DESIGNATIONS

| | |
|---|---|
| 1989 – Present | **Forensic Mental Health Supervisor**<br>Division of Forensic Mental Health<br>Massachusetts Department of Mental Health |
| 1989 – Present | **Designated Forensic Psychologist**<br>Division of Forensic Mental Health<br>Massachusetts Department of Mental Health |
| 1986 – Present | **Licensed Psychologist Provider**<br>Commonwealth of Massachusetts |

## APPOINTMENTS

| | |
|---|---|
| 1993 – 1994 | **Adjunct Faculty in Psychology, Antioch New England Graduate School,** Keene, NH |
| 1992 – 1993 | **Adjunct Faculty in Psychology, Mass. School of Professional Psychology,** Boston, MA |
| 1985 – 1991 | **Instructor in Psychology, Harvard Medical School, Dept. of Psychiatry,** Boston, MA |
| 1986 – 1991 | **Assistant Attending Psychologist, McLean Hospital,** Belmont, MA |

## ADDITIONAL TEACHING/TRAINING

| | |
|---|---|
| 2000 – Present | Member, Continuous Quality Improvement Committee for Adult Court Clinics, Commonwealth of Massachusetts |
| 2001 – 2005 | Member, Designated Forensic Professional Qualifying Committee, Commonwealth of Massachusetts |
| 1993 – 1995 | Director of Training in Psychology, Bridgewater State Hospital |
| 1994 – 1995 | Member, Forensic Practice Committee, Bridgewater State Hospital |
| 1991 – 1994 | Member, Clinical Training Committee, Bridgewater State Hospital |
| 1988 – 1991 | Chair, Forensic Training Committee, Bridgewater State Hospital |

## PROFESSIONAL AFFILIATIONS

| | |
|---|---|
| 1986 – Present | Massachusetts Psychological Association, Member |
| 1986 – Present | American Psychology—Law Society, Member |
| 1986 – 1993 | American Psychological Association, Member |

# Carney & Bassil

A Professional Corporation
Attorneys at Law
20 Park Plaza, Suite 1405
Boston, MA 02116
TEL. (617) 338-5566
FAX (617) 338-5587

J. W. Carney, Jr.
Janice Bassil
Michael J. Traft
Andrew M. D'Angelo
Reinaldo Gonzalez
Rosanne Klovee

James M. Doyle
*Of Counsel*

_____

www.CarneyBassil.com

## AUTHORIZATION FOR RELEASE OF INFORMATION

David Samuel Torres        5 /30/81    592/80/9276 _____
(patient/client/resident name)       (D.O.B)       (Social Security #)       Health Record No.

I hereby authorize _____ to release specific
                                    (Provider, Facility or Program Name)

information contained in my records to the individual or organization listed below:

THE LAW OFFICE OF CARNEY & BASSIL, P.C. _____
(Person/Organization to whom information will be disclosed)

____20 Park Plaza, Suite 1405 _____    __Boston__    __MA__    __02116__
                (Street)                                    (City/Town)       (State)       (Zip)

Dates of Service Requested: _____

This information is being disclosed for the purpose of (*check appropriate reason*)
☐ Job Stability                        ☐ Legal
☐ Comprehensive Treatment   ☐ Continuing Care
☐ Family Involvement            ☐ Other _____

*Please check one:*
I ☑ DO /☐ DO NOT authorize the release of information pertaining to testing, treatment, diagnosis of
psychiatric, drug and/or alcohol abuse, sexually transmitted diseases.   Initials: _DT_

I ☑ DO /☐ DO NOT authorize to release information pertaining to HIV or AIDS related testing,
diagnosis, and/or treatment.   Initials: _DT_

The type and amount of information to be used or disclosed is as follows:
_____ problem list
_____ medical list
_____ list of allergies
_____ immunization record
_____ most recent history and physical
_____ most recent discharge summary
_____ laboratory results from _____ to _____
_____ x-ray and imaging reports from _____ to _____
_____ consultation reports
_____ entire record
_____ other _____

MLC   6850 CORAL WAY • SUITE 101 - MIAMI FLORIDA 33155

| PATIENT-INFORMATION | LAB -NUMBER | DATE COLLECTED | ACCOUNT-INFORMATION | |
|---|---|---|---|---|
| | 00408657 | 06/17/04 | 109 | |
| TORRES, DAVID | DATE RECEIVED | DATE REPORTED | GUILLERMO FONT M.D. | |
| | | | 407 LINCOLN ROAD | |
| | 06/17/04 | 06/18/04 | MIAMI BEACH, FL  3313 | |
| AGE:          SEX: M | DATE PRINTED: 06/18/04 | | | |
| TEST NAME OR PROCEDURE | RESULT | OUTSIDE RANGE | REFERENCE RANGE | UNITS |

```
STS ORDERED: PAN 14,  LIPID,THYR, CBC
   PAN - METABOLIC PANEL 14
     GLUCOSE SERUM                      61 L        74-106      MG/DL
     SGOT (AST)                         35 H        8-20        IU/L
     ALKALINE PHOSPHATASE       89                  25-100      IU/L
     BUN                        14.0                6-20        MG/DL
     CALCIUM                    10.0                8.6-10.0    MG/DL
     BILIRUBIN TOTAL                    1.8 H       0.3-1.2     MG/DL
     CREAT SERUM                1.1                 0.6-1.3     MG/DL
     TOTAL PROTEIN              7.0                 6.2-8.2     G/DL
     ALBUMIN                    4.7                 3.4-4.8     G/DL
     SODIUM (Na)                145                 136-145     MMOL/L
     POTASSIUM (K)              3.5                 3.4-5.1     MMOL/L
     CHLORIDE (Cl)              102                 98-107      MMOL/L
     CO2                                31 H        22-29       MMOL/L
     SGPT (ALT)                 40                  7-40        IU/L
                                                    TEST DATE: 06/17/04

   CBC
     WHITE BLOOD CELL COUNT     6.39                4.30-11.00x10.e3uL
     RED BLOOD CELL COUNT       4.58                3.8-7.0  x10.e3uL
     HEMOGLOBIN                 14.4                14.0-18.0 g/dL
     HEMATOCRIT                 43.1                42.0-52.0 %
     MCV                        94.2                80-100    fL
     MCH                        31.40               25.0-35.0 pg
     MCHC                       33.3                31.0-37.0 g/dL
     % BASOPHILES               0.8                 0.0-2.0   %
     % LYMPHOCYTES              30.6                20.0-55.0 %
     % MONOCYTES                5.4                 1.7-9.3   %
     % EOSINOPHILES             1.0                 0.0-7.0   %
     % GRANULOCYTES             60.3                42.0-75.0 %
     % LUC                      2.1                 <5.0     x10.e3uL
     RDW                        13.0                11.5-17.0 %
     MPV                        9.5                 7.4-10.4  fL
     # LYMPHOCYTES              1.95                0.9-5.2  x10.e3uL
     # NEUTROPHILS              3.85                1.9-8.0  x10.e3uL
     PLATELET COUNT             174                 140-440  x10.e3uL
                                                    TEST DATE: 06/17/04

   LIPID PANEL
     CHOLESTEROL                175                 0-200     MG/DL
     TRIGLYCERIDES              93                  <150      MG/DL
          ****REFERENCE RANGES FOR TRIGLYCERIDES***
                    BORDERLINE-HIGH  150-199 (MG/DL)
                         HIGH  200-499 (MG/DL)
     HDL                        45                  40-100    MG/DL
     LDL (CALCULATION)          111                 0-130
     CHOL/HDL RATIO             3.9
                                                    TEST DATE: 06/17/04

   THYROID PANEL II
CONTINUED ON NEXT PAGE
THORIZED
GNATURE:
```



# Mogar Laboratory, Corp.
6850 CORAL WAY • SUITE 101 - MIAMI FLORIDA 33155

**REPORT FORM**

PHONE: (786) 268-1116
FAX: (786) 268-1117

| PATIENT-INFORMATION | LAB -NUMBER | DATE COLLECTED | ACCOUNT-INFORMATION |
|---|---|---|---|
| TORRES, DAVID | 00408657 | 06/17/04 | 109 |
| | DATE RECEIVED | DATE REPORTED | GUILLERMO FONT M.D. |
| | | | 407 LINCOLN ROAD |
| | 06/17/04 | 06/18/04 | MIAMI BEACH, FL 3313 |
| AGE: SEX: M | DATE PRINTED: 06/18/04 | | |

| TEST NAME OR PROCEDURE | RESULT | OUTSIDE RANGE | REFERENCE RANGE | UNITS |
|---|---|---|---|---|
| ESTS ORDERED: PAN 14, ,LIPID,THYR,CBC | | | | |
| T3 UPTAKE | 27.8 | | 22.5-37.0 % | |
| T4 | 5.7 | | 4.5-12.0 UG/DL | |
| T7 (FTI) | 1.6 | | 1.6-3.7 | |
| TSH | 2.08 | | 0.35-5.50 uIU/ml | |
| | | | TEST DATE: 06/18/04 | |

PLEASE NOTE NEW CHEMISTRY METHOD & RANGES SINCE 12/10/03



# Mogar Laboratory, Corp.

6850 CORAL WAY • SUITE 101 - MIAMI FLORIDA 33155

## REPORT FORM

PHONE: (786) 268-1·
FAX: (786) 268-1·

| PATIENT-INFORMATION | LAB-NUMBER | DATE COLLECTED | ACCOUNT-INFORMATION |
|---|---|---|---|
| TORRES, DAVID | 00408656 | 06/17/04 | 109 |
| | DATE RECEIVED | DATE REPORTED | GUILLERMO FONT M.D. |
| | | | 407 LINCOLN ROAD |
| | 06/17/04 | 06/18/04 | MIAMI BEACH, FL 3313 |
| AGE: SEX: M | DATE PRINTED: 06/18/04 | | |

| TEST NAME OR PROCEDURE | RESULT | OUTSIDE RANGE | REFERENCE RANGE | UNITS |
|---|---|---|---|---|

TESTS ORDERED: HIV & RPR PANEL

```
HIV & RPR PANEL
  HIV ANTIBODY              NEGATIVE                      NEGATIVE
           **HIV-ANTIBODY-EIA (HUMAN IMMUNODEFICIENCY VIRUS
           FORMERLY KNOWN AS HTLV-III). HIV POSITIVITY DOES NOT
           NECESSARILY INDICATE ACTIVE AIDS.
  RPR                       NON-REACTIVE                  NON-REACTI
                                                          TEST DATE: 06/18/04
```

AUTHORIZED

PLEASE NOTE NEW CHEMISTRY METHOD & RANGES SINCE 12/10/03

**GUILLERMO L. FONT, M. .P.A.**
407 LINCOLN ROAD, SUITE 10F
MIAMI BEACH, FLORIDA 33139

305-532-9004

PATIENT'S NAME: _DAVID Torres_ CODE NO: _9213_ SERVICE DATE: _06/17/04_

CHIEF COMPLAINT: _P. E_

PAST MEDICAL HISTORY: _Lf Wrist fx_

FAMILY HISTORY: _mother au l John O.lf_

PHYSICAL EXAMINATION:

WEIGHT: _140_ HEIGHT: _5'5"_ B/P: _130/80_ TEMP: _98°_ PULSE: _80_

HEAD: _Noa-exp_

EYES: _n l n n l_

EARS: _il_

THYROID: _w x r_

CHEST: _no W한e aulileh Murmur_

HEART: _rs. r._

LUNGS: _clea_

ABDOMEN: _all neg_

UPPER EXTREMETIES: _w n c . (l s.11)_

LOWER EXTREMETIES: _h willo-_

ALLERGIES: _N / IC / n_

DIAGNOSIS: _l a il_

TREATMENT: _Blood Q..._
_aoline a lohled_

IMPRESSIONS: _____

PROGNOSIS: _____

LABORATORY TEST & X-RAYS: _____ CODE NO. _____

REFERRAL: _____

PATIENT'S SIGNATURE

TIME IN: _____
TIME OUT:

# Mogar Laboratory, Corp.

**REPORT FORM**

6850 CORAL WAY • SUITE 101 - MIAMI FLORIDA 33155

PHONE: (786) 268-1116
FAX: (786) 268-111

| PATIENT-INFORMATION | LAB -NUMBER | DATE COLLECTED | ACCOUNT-INFORMATION |
|---|---|---|---|
| TORRES, DAVID | 00119634 | 04/17/02 | 109 |
| | DATE RECEIVED | DATE REPORTED | GUILLERMO FONT M.D. |
| | 04/17/02 | 04/18/02 | 407 LINCOLN ROAD |
| AGE: 100       SEX: M | DATE PRINTED: | 04/18/02 | MIAMI BEACH, FL  33139 |

| TEST NAME OR PROCEDURE | RESULT | OUTSIDE RANGE | REFERENCE RANGE | UNITS |
|---|---|---|---|---|
| COMP. METABOLIC PANEL 14 | | | | |
| GLUCOSE SERUM | | 67 L | 75-110 | MG/DL |
| SGOT (AST) | 25 | | 17-59 | MG/DL |
| ALKALINE PHOSPHATASE | 126 | | 40-130 | U/L |
| BUN | 14 | | 9-20 | MG/DL |
| CALCIUM | 9.3 | | 8.4-10.2 | MG/DL |
| BILIRUBIN TOTAL | | 1.6 H | 0.2-1.3 | MG/DL |
| CREAT SERUM | 1.0 | | 0.5-1.5 | MG/DL |
| TOTAL PROTEIN | 7.4 | | 6.2-8.2 | G/DL |
| ALBUMIN | 4.7 | | 3.5-5.0 | G/DL |
| SODIUM (Na) | 142 | | 135-148 | MEQ/L |
| POTASSIUM (K) | 3.5 | | 3.5-5.5 | MMOL/L |
| CHLORIDE (Cl) | 100 | | 98-109 | MEQ/L |
| CO2 | 28 | | 23-29 | MEQ/L |
| SGPT (ALT) | 25 | | 17-59 | MG/DL |
| | | | TEST DATE: 04/18/02 | |
| CBC | | | | |
| WHITE BLOOD CELL COUNT | 9.0 | | 4.3-11.0 | 1000/CU△ |
| RED BLOOD CELL COUNT | 4.9 | | 3.8-7.0 | 1000/CUM |
| HEMOGLOBIN | 15.0 | | 14.0-18.0 | G/DL |
| HEMATOCRIT | 44.3 | | 42.0-52.0 | % |
| MCV | 91.3 | | 80.0-100.0 | FL |
| MCH | 31 | | 25-35 | UUG |
| MCHC | 34 | | 31.0-37.0 | |
| % BASOPHILES | 0.4 | | 0.0-2.0 | % |
| % LYMPHOCYTES | 22.0 | | 20.5-51.1 | % |
| % MONOCYTES | 8.4 | | 1.7-9.3 | % |
| % EOSINOPHILES | 0.6 | | 0.0-7.0 | % |
| % GRANULOCYTES | 68.6 | | 42.2-75.2 | % |
| PLATELET COUNT | 277 | | 140-440 | 1000/CUM |
| RDW | 13.1 | | 11.5-14.5 | % |
| MPV | 9.9 | | 7.4-10.4 | FL |
| | | | TEST DATE: 04/17/02 | |
| LIPID PANEL | | | | |
| CHOLESTEROL | 153 | | 0-200 | MG/DL |
| TRIGLYCERIDES | 89 | | (150 | MG/DL |

****REFERENCE RANGES FOR TRIGLYCERIDES***
                    BORDERLINE HIGH  150-199 (MG/DL)
                               HIGH  200-499 (MG/DL)

| | | | | |
|---|---|---|---|---|
| HDL | 56 | | 30-75 | MG/DL |
| LDL (CALCULATION) | 79 | | 0-130 | |
| CHOL/HDL RATIO | 2.7 | | | |

*****C.H.D. RISK FACTORS***** CHOLESTEROL/HDL RATIO*****
----------------------------------------------------

| | MALE | FEMALE |
|---|---|---|
| 1/2 AVERAGE | 3.4 | 3.3 |
| AVERAGE (NORMAL) | 5.0 | 4.4 |
| TWICE AVERAGE (MODERATE) | 9.6 | 7.0 |
| THREE TIMES AVERAGE (HIGH) | 13.4 | 11.0 |

CONTINUED ON NEXT PAGE

AUTHORIZED
SIGNATURE



# Mogar Laboratory, Corp.

6850 CORAL WAY • SUITE 101 - MIAMI FLORIDA 33155

**REPORT FORM**

PHONE: (786) 268-111.6
FAX: (786) 268-111.

| PATIENT-INFORMATION | LAB -NUMBER | DATE COLLECTED | ACCOUNT-INFORMATION |
|---|---|---|---|
| TORRES, DAVID | 00119634 | 04/17/02 | 109 |
| | DATE RECEIVED | DATE REPORTED | GUILLERMO FONT M.D. |
| | | | 407 LINCOLN ROAD |
| | 04/17/02 | 04/18/02 | MIAMI BEACH, FL  33139 |
| AGE: 100          SEX: M | DATE PRINTED:    04/18/02 | | |

| TEST NAME OR PROCEDURE | RESULT | OUTSIDE RANGE | REFERENCE RANGE | UNITS |
|---|---|---|---|---|

***DATA BASED ON FARMINGHAM STUDY***

TEST DATE: 04/18/02

| THYROID PANEL II | | | | |
|---|---|---|---|---|
| T3 UPTAKE | 34.4 | | 22.5-37.0 | % |
| T4 | 5.9 | | 4.5-12.0 | UG/DL |
| T7 (FTI) | 2.0 | | 1.6-3.7 | |
| TSH | 1.69 | | 0.35-5.50 | ulU/ml |

TEST DATE: 04/18/02

AUTHORIZED
SIGNATURE       HILARIO ISABA, M.D. MEDICAL DIRECTOR

# GUILLERMO L. FONT, M.D.P.A.
### 407 LINCOLN ROAD, SUITE 10F
### MIAMI BEACH, FLORIDA 33139

305-532-9004

PATIENT'S NAME: _David Torres_    CODE NO: _95813_ SERVICE DATE: _04/17/02_

CHIEF COMPLAINT: _____

PAST MEDICAL HISTORY: _____

FAMILY HISTORY: _____

PHYSICAL EXAMINATION: _____

WEIGHT: _144_ HEIGHT: _5'9"_ B/P: _130/81_ TEMP: _98°_ PULSE: _80_

HEAD: _____

EYES: _____

EARS: _____

THYROID: _____

CHEST: _____

HEART: _____

LUNGS: _____

ABDOMEN: _____

UPPER EXTREMETIES: _____

LOWER EXTREMETIES: _____

ALLERGIES: _____

DIAGNOSIS: _____

TREATMENT: _____

IMPRESSIONS: _____

PROGNOSIS: _____

LABORATORY TEST & X-RAYS: _____ CODE NO. _____

REFERRAL: _____

TIME IN: _____

# GUILLERMO L. FONT, M.D.P.A.
**407 LINCOLN ROAD, SUITE 10F**
**MIAMI BEACH, FLORIDA 33139**

305-532-9004

PATIENT'S NAME: _David S. Torres_  CODE NO: _99214_  SERVICE DATE: _10/18/00_

CHIEF COMPLAINT: _Cough_

PAST MEDICAL HISTORY: _No Sin Joy_

FAMILY HISTORY: _Nat Contribly_

PHYSICAL EXAMINATION: _____

WEIGHT: _130_  HEIGHT: _5'9_  B/P: _110/70_  TEMP: _100_  PULSE: _80_

HEAD: _Non cont_

EYES: _Eg R O nn1_

EARS: _Eir at_

THYROID: _W d a_

CHEST: _O bal Nand aus culled Ver eur_

HEART: _N S R_

LUNGS: _On Augested c Wheezing - Nored_

ABDOMEN: _Abd Ney Weife Delng_

UPPER EXTREMETIES: _W d_

LOWER EXTREMETIES: _Eg hs bull0_

ALLERGIES: _____

DIAGNOSIS: _Bronchlli_

TREATMENT: _Aerosol TID  5X Dryp._
_Zithrax Dio D-1X 5 day_
_Slow iy Dn   D C_

IMPRESSIONS: _____

PROGNOSIS: _____

LABORATORY TEST & X-RAYS: _____  CODE NO. _____

REFERRAL: _____

TIME IN: _____
TIME OUT: _____

NAME: _David Torres_ AGE: _15_ DATE OF BIRTH: _5/30/81_

## MEDICAL EXAMINATION

| | | NORMAL | ABNORMAL | COMMENTS/FOLLOW-UP |
|---|---|---|---|---|
| HEIGHT | 5'8" | | | |
| WEIGHT | 127 LBS | | | |
| B/P | 120/80 | ✓ | | |
| PULSE | 80 | ✓ | | |
| SKIN | | ✓ | | |
| NOSE,MOUTH,THROAT | | ✓ | | |
| NECK GLANDS | | ✓ | | |
| CHEST, LUNGS | | ✓ | | |
| HEART | | ✓ | | |
| ABDOMEN | | ✓ | | |
| HERNIA | | ✓ | | |
| VISION: LEFT 20/ _20_ | | ✓ | | |
| RIGHT 20/ _30_ | | ✓ | | |

## ORTHOPEDIC EXAMINATION

| | | NORMAL | ABNORMAL | COMMENTS/FOLLOW-UP |
|---|---|---|---|---|
| SPINE | | | | |
| HIP | (L) (R) | | | |
| SHOULDER | (L) (R) | | | |
| ELBOW | (L) (R) | | | |
| WRIST | (L) (R) | | | |
| KNEE | (L) (R) | | | |
| ANKLE | (L) (R) | | | |
| FOOT | (L) (R) | | | |
| GAIT | | | | |
| POSTURE | | | | |

## ONE OF THE FOLLOWING MUST BE CHOSEN FOR THIS ATHLETE TO PARTICIPATE

1. ☒ Full, unlimited participation

2. ☐ Limited participation, indicate sport and/or type of limitation _____

   ☐ Clearance pending release by family physician _____

4. ☐ No athletic participation _____

PHYSICIAN'S SIGNATURE _____ DATE: _1/09/96_

# GUILLERMO L. FONT, M.D.P.A.
## 420 LINCOLN ROAD, SUITE 341
## MIAMI BEACH, FLORIDA 33139

532-9004

PATIENT'S NAME: _____ CODE NO: 99213 SERVICE DATE: 8/16/96

CHIEF COMPLAINT: _____

PAST MEDICAL HISTORY: _____

FAMILY HISTORY: _____

PHYSICAL EXAMINATION: _____

WEIGHT: 120 HEIGHT: 5'8" B/P: 120/80 TEMP: 98 PULSE: 80

HEAD: _____

EYES: _____

EARS: _____

THYROID: _____

CHEST: _____

HEART: _____

LUNGS: _____

ABDOMEN: _____

UPPER EXTREMETIES: _____

LOWER EXTREMETIES: _____

ALLERGIES: _____

DIAGNOSIS: _____

TREATMENT: _____

IMPRESSIONS: _____

PROGNOSIS: _____

LABORATORY TEST & X-RAYS: _____ CODE NO. _____

REFERRAL: _____

TIME IN: _____
TIME OUT: _____

## GUILLERMO L. FONT, M.D.P.A.
### 420 LINCOLN ROAD, SUITE 341
### MIAMI BEACH, FLORIDA 33139

MAY 22, 1997

REF:  DAVID S. TORRES
DOB:  5-31-81

To whom it  may concern:

I wish to recommend Mr. David Samuel Torres, whom I known for more than
6 years.

Mr. Torres is studious, reliable and hardworking young man. I endorse
Mr. Torres without reservation because I am sure he is an asset in
the working place.

If I can be of any futher help on behalf of Mr. Torres, please do not
hesitate to contact me.

Thank you;

Sincerely yours;

GUILLERMO L. FONT, M.D. PA.

GLT/lt

PHONE: (305) 445-
FAX: (305) 445-
MEDICARE NUMBER 10-

*Scientific Medical Laboratory, Inc.*   **REPORT FORM**
242 N.W. LE JEUNE ROAD • SUITE 401 MIAMI, FLORIDA 33126

| PATIENT INFORMATION | LAB NUMBER | DATE RECEIVED | ACCOUNT INFORMATION |
|---|---|---|---|
| TORRES, DAVID | A4178731 | 04/02/96 | FONT, GUILLERMO L. |
| | REPORT DATE | | 420 LINCOLN ROAD |
| | 04/03/96 | | SUITE 341 |
| | **CONTINUED REPORT** | | MIAMI BEACH, FL  3313 |
| AGE:  SEX: M | | | |

| TEST NAME OR PROCEDURE | RESULT | OUTSIDE RANGE | REFERENCE RANGE | UNITS |
|---|---|---|---|---|
| T3 UPTAKE | 30.5 | | 27.8-40.7 | % |
| T4 | 5.6 | | 4.5-12.0 | ug/d |
| T7 (FTI) | 1.7 | | 1.6 - 3.7 | |
| COMPLETE BLOOD COUNT & DIFFERENTIAL | | | | |
| WBC | 4.8 | | 4.8 - 10.8 | 1000 |
| RBC | 5.07 | | 4.1 - 5.5 | 1000 |
| HGB | 15.5 | | 14 - 18 | G/DL |
| HCT | 45.6 | | 42 - 52 | % |
| MCV | 89.9 | | 80 - 94 | FL |
| MCH | 30.4 | | 28 - 32 | UUG |
| MCHC | 34.0 | | 32 - 36 | % |
| EOSINOPHILES | 4.6 | | 0 - 7 | % |
| BASOPHILES | 0.0 | | 0 - 2 | % |
| % GRANULOCYTES | | 32.5 (L) | 42.2-75.2 | % |
| % LYMPHOCYTES | | 54.6 (H) | 20.5-51.1 | % |
| % MONOCYTES | 8.3 | | 1.7 - 9.3 | % |
| PLATELET COUNT | 156 | | 130 - 400 | 1000 |
| RDW | 13.6 | | 11.5-14.5 | % |
| MPV | 9.7 | | 7.4 - 10.4 | FL |
| URINALYSIS PROFILE | | | | |
| COLOR URINE | YELLOW | | | |
| APPEARANCE | CLEAR | | | |
| SPECIFIC GRAVITY | 1.025 | | 1.006-1.035 | |
| pH | 5.0 | | 5.0 - 6.5 | |
| LEUCOCYTE URINE | 25 | | < 25 | uL |
| NITRITE URINE | neg | | NEGATIVE | MG/DL |
| PROTEIN URINE | 15 | | < 15 | MG/DL |
| GLUCOSE URINE | norm | | < 50 | MG/DL |
| ACETONE URINE | neg | | < 5 | MG/DL |
| UROBILINOGEN URINE | norm | | 0.2 - 1.0 | MG/DL |
| BILIRUBIN URINE | neg | | < 1 | MG/DL |
| OCCULT BLOOD URINE | 10 | | < 10 | uL |
| WBC URINE | occ | | 0 - 5 | HPF |
| EPITH CELLS URINE | 5-10 | | NONE | PF |

**\*\*\* FINAL REPORT \*\*\***

*Scientific Medical Laboratory, Inc.*

REPORT FORM

PHONE: (305) 445-61..
FAX: (305) 445-444.
MEDICARE NUMBER 10-83.

242 N.W. LE JEUNE ROAD • SUITE 401 MIAMI, FLORIDA 33126

| PATIENT INFORMATION | LAB NUMBER | DATE RECEIVED | ACCOUNT INFORMATION |
|---|---|---|---|
| TORRES, DAVID | A4178731 | 04/02/96 | FONT, GUILLERMO L. M. |
| | REPORT DATE | | 420 LINCOLN ROAD |
| | 04/03/96 | | SUITE 341 |
| AGE:   SEX: M | | | MIAMI BEACH, FL  33139 |

| TEST NAME OR PROCEDURE | RESULT | OUTSIDE RANGE | REFERENCE RANGE | UNITS |
|---|---|---|---|---|
| SML 24, CBC, HDL, LDL, THYROID & URINALYSIS PROFILE | | | | |
| SML 24 PROFILE | | | | |
| GLUCOSE (SERUM) | 40 | (L) | 70 - 105 | MG/DL |
| "RESULTS RECHECKED, FALSELY DECREASED | | | | |
| GLUCOSE VALUES CAN OCCUR WHEN SERUM IS | | | | |
| ALLOWED TO REMAIN IN CONTACT WITH RED | | | | |
| BLOOD CELLS FOR A PROLONGED PERIOD OF | | | | |
| TIME." | | | | |
| SGOT (AST) | 29 | | < 37 | U/L |
| SGPT (ALT) | 23 | | < 40 | U/L |
| GGTP | 16 | | 11 - 51 | U/L |
| LACTIC DEHYDROGENASE (LDH) | 328 | (H) | 94 - 250 | U/L |
| ALKALINE PHOSPHATASE | 262 | (H) | 39 - 117 | U/L |
| BUN | 15 | | 6 - 19 | MG/DL |
| CARBON DIOXIDE (CO2) | 22 | (L) | 23 - 29.2 | MEQ/L |
| CALCIUM | 9.5 | | 8.4 - 10.2 | MG/DL |
| PHOSPHOROUS | 3.6 | | 2.5 - 4.5 | MG/DL |
| BILIRUBIN TOTAL | 1.9 | (H) | .2 - 1.2 | MG/DL |
| CREATININE SERUM | 0.7 | | .5 - 1.2 | MG/P |
| CHOLESTEROL | 144 | | < 200 | MG/L |
| TRIGLYCERIDES | 109 | | 30 - 200 | MG/DL |
| TOTAL PROTEIN | 8.0 | | 6.0 - 8.5 | G/DL |
| ALBUMIN | 5.1 | (H) | 3.4 - 5.0 | G/DL |
| URIC ACID | 4.0 | | 3.4 - 8.0 | MG/DL |
| SODIUM (NA) | 138 | | 135 - 148 | MEQ/L |
| POTASSIUM (K) | 5.7 | (H) | 3.3 - 5.3 | MEQ/L |
| CHLORIDE | 104 | | 96 - 108 | MEQ/L |
| A/G RATIO | 1.76 | | 1.1 - 1.8 | |
| BUN/CREATININE RATIO | 21.4 | | 6 - 25 | |
| GLOBULIN | 2.9 | | 2.3 - 3.5 | |
| OSMOLALITY SERUM | 264.3 | | 262 - 300 | MOS/K |
| CHOL/HDL RATIO | 2.5 | | | |
| ***CORONARY HEART DISEASE RISK TABLE*** | | | | |
| RELATIVE RISK | T/HDL CHOL RATIO | | | |
| MALE | 0.5 AVERAGE | 3.43 | | |
| | AVERAGE | 4.97 | | |
| | 2 X AVERAGE | 9.55 | | |
| | 3 X AVERAGE | 13.39 | | |
| FEMALE | 0.5 AVERAGE | 3.27 | | |
| | AVERAGE | 4.44 | | |
| | 2 X AVERAGE | 7.05 | | |
| | 3 X AVERAGE | 11.04 | | |
| HDL | 57.7 | | 30 - 75 | |
| LDL | 65 | | < 130 | |
| VLDL | 21.8 | | | |

REPORT CONTINUED ON NEXT FORM

PAGE 1

NAME David Torres    AGE 14 DATE OF BIRTH 5/ 26/ 81

## MEDICAL EXAMINATION

|  | NORMAL | ABNORMAL | COMMENT/FOLLOW-UP |
|---|---|---|---|
| HEIGHT 62" WEIGHT 116 | ✓ |  |  |
| B.P. 120/80 PULSE 80 | ✓ |  |  |
| SKIN ................ | ✓ |  |  |
| NOSE, MOUTH, THROAT ... | ✓ |  |  |
| NECK, GLANDS.......... | ✓ |  |  |
| CHEST, LUNGS .......... | ✓ |  |  |
| HEART ................ | ✓ |  |  |
| ABDOMEN .............. | ✓ |  |  |
| HERNIA ............... | ✓ |  |  |

VISION: LEFT 20/ 20    RIGHT 20/ 20

## ORTHOPEDIC EXAMINATION

|  | NORMAL | ABNORMAL | COMMENT/FOLLOW-UP |
|---|---|---|---|
| SPINE ............... |  |  |  |
| HIP (R) ............. |  |  |  |
| HIP (L) ............. |  |  |  |
| SHOULDER (R) ......... |  |  |  |
| SHOULDER (L) ......... |  |  |  |
| ELBOW (R) ........... |  |  |  |
| ELBOW (L) ........... |  |  |  |
| WRIST (R) ........... |  |  |  |
| WRIST (L) ........... |  |  |  |
| KNEE (R) ............ |  |  |  |
| KNEE (L) ............ |  |  |  |
| ANKLE (R) ........... |  |  |  |
| ANKLE (L) ........... |  |  |  |
| FOOT (R) ............ |  |  |  |
| FOOT (L) ............ |  |  |  |
| GAIT ................ |  |  |  |
| POSTURE ............. |  |  |  |

ONE OF THE FOLLOWING MUST BE CHOSEN FOR THIS ATHLETE TO PARTICIPATE:

1.   X    Full, Unlimited Participation

2. _____ Limited Participation.  Indicate sport and/or type of limitation _____

3. _____ Clearance pending release by Family Physician.

4. _____ NO ATHLETIC PARTICIPATION

_____    10 / 17 / 95

PHYSICIAN'S SIGNATURE                DATE

### GUILLERMO L. FONT, M.D.P.A.
420 LINCOLN ROAD, SUITE 341
MIAMI BEACH, FLORIDA 33139

532-9004

PATIENT'S NAME: _David Touri_    CODE NO: _99213_    SERVICE DATE _6/1/05_

CHIEF COMPLAINT: _____

PAST MEDICAL HISTORY: _No surgery _____

FAMILY HISTORY: _____

PHYSICAL EXAMINATION: _____

WEIGHT: _10 Y_    HEIGHT: _5'6'_    B/P: _110/70_    TEMP: _98_    PULSE: _80_

HEAD: _____

EYES: _____

EARS: _____

THYROID: _____

CHEST: _____

HEART: _____

LUNGS: _____

ABDOMEN: _____

UPPER EXTREMETIES: _____

LOWER EXTREMETIES: _____

ALLERGIES: _____

DIAGNOSIS: _low back pain_

TREATMENT: _____

IMPRESSIONS: _____

PROGNOSIS: _____

LABORATORY TEST & X-RAYS: _____    CODE NO. _____

REFERRAL: _____

TIME IN: _____
TIME OUT: _____

**CHRISTOPHER COLUMBUS HIGH SCHOOL**
3000 S.W. 87 Avenue, Miami, Florida 33165-3293
Conducted by the Marist Brothers of the Schools

CEEB/ACT NO. 100046

**NAME**
David S Torres
3181 N W 4 TERT
Miami, Fl                              99-312

SOCIAL SEC. NO. 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

DATE ENTERED 8/95    GRADE 9    PREVIOUS SCHOOL

☑ was graduated
☐ withdraw to _____ on 5-29-99 (Date)

PARENTS' NAMES
Francisco and Lidia Torres

PLACE OF BIRTH St. Michael Archangel

PLACE OF BIRTH Miami, Florida    (City) Miami    DATE OF BIRTH 5-30-81    (State) Florida

Signature _____ 6/7/05

---

Torres, David S

| | Phase | 99-312 Credit | Mark |
|---|---|---|---|
| English 10 | 3 | 1.00 | B+ |
| Geometry | 3 | 1.00 | C- |
| Spanish S3 | 3 | 1.00 | B- |
| Eur Civilization | 3 | 0.50 | B- |
| Scripture Lit | 3 | 0.50 | A- |
| Life Management | 3 | 0.50 | B+ |
| Physical Science | 3 | 1.00 | B+ |
| Fundamental Art 1 | 3 | 0.50 | B- |

Current Average 2.70    Rank 182/330
Absent 9    Late 1    Credits 6.00
Cumulative Avg 2.990    Rank 144/330

---

Torres, David S

| | Phase | 99-312 Credit | Mark |
|---|---|---|---|
| English 12 | 3 | 1.00 | B- |
| Speech | 3 | 0.50 | B- |
| U.S. Culture | 3 | 0.50 | C+ |
| Coll Alg & Trig | 3 | 1.00 | B- |
| Computer Applics | 3 | 0.50 | C+ |
| Economics | 3 | 0.50 | C+ |
| US Government | 3 | 0.50 | B+ |
| US Foreign Policy | 3 | 0.50 | B |
| Florida History | 3 | 0.50 | B |
| Christian Living | 3 | 0.50 | B+ |

Current Average 2.75    Rank 217/307
Absent 12    Late 8    Credits 6.00
Cumulative Avg 2.965    Rank 173/307

---

Torres, David S

| | Phase | 99-312 Credit | Mark |
|---|---|---|---|
| English 9 | 3 | 1.00 | B- |
| Basic Algebra 1 | 2 | 1.00 | A+ |
| Spanish S2 | 3 | 1.00 | C+ |
| World History | 3 | 1.00 | B+ |
| Intro to Religion | 3 | 0.50 | A- |
| Biology | 3 | 1.00 | B |
| Personal Fitness | 3 | 0.50 | A+ |

Current Average 3.28    Rank 117/329
Absent 6    Late 0    Credits 6.00
Cumulative Avg 3.280    Rank 117/329

---

Torres, David S

| | Phase | 99-312 Credit | Mark |
|---|---|---|---|
| English 11 | 3 | 1.00 | B- |
| Algebra 2 | 3 | 1.00 | B- |
| Word Processing | 3 | 0.50 | B |
| American History | 3 | 1.00 | B- |
| Int. Affairs | 3 | 0.50 | B- |
| Morality & Ethics | 3 | 0.50 | A- |
| Topics in Chem. | 2 | 1.00 | B |
| Art 2 | 3 | 0.50 | B+ |

Current Average 2.89    Rank 189/308
Absent 7    Late 2    Credits 6.00
Cumulative Avg 2.957    Rank 158/308

# Carney & Bassil

A Professional Corporation

Attorneys at Law

20 Park Plaza
Suite 1405
Boston, MA 02116

TEL (617) 338-5566
FAX (617) 338-5587

J. W. CARNEY, JR
JANICE BASSIL
MICHAEL J TRAFT
ANDREW M D'ANGELO
REINALDO GONZALEZ
ROSANNE KLOVEE

JAMES M DOYLE
OF COUNSEL

www.CarneyBassil.com
admin@CarneyBassil.com

**Date:** 5/31    **Document Also to be Mailed: Yes** ____ **NO** ✗

**Number of Pages:** 5    **including cover sheet.**

**To:** Ms. Fernandez

**Firm:** Christopher Columbus High School

**Fax #:** 305 - 223 - 5829

**From:** Dean Vatalaro

**Re:** David S. Torres

**Comments:** _____

_____

_____

_____

_____

_____

_____

The information contained in the following message is intended for the individual or entity named above and is therefore both confidential and potentially subject to legal privilege against disclosure. If you have received this message in error, please contact this office immediately at (617) 338-5566.
Thank you.

The Sender

# Carney & Bassil

A Professional Corporation
Attorneys at Law

20 Park Plaza, Suite 1405
Boston, MA 02116
TEL. (617) 338-5566
FAX (617) 338-5587

J. W. Carney, Jr.
Janice Bassil
Michael J. Traft
Andrew M. D'Angelo
Reinaldo Gonzalez
Rosanne Klovee

James M. Doyle
Of Counsel

www.CarneyBassil.com
admin@CarneyBassil.com

## AUTHORIZATION FOR RELEASE OF RECORDS

I hereby authorize you to release any and all hospital, medical, psychiatric, psychological, treatment center or institutional records, as well as any and all bills and information of any description, which you may have concerning me to my attorneys, Carney & Bassil, and to permit them to obtain a copy of such records.

In addition, I authorize you to release any and all records of any other nature which pertain to me, including school records, accident reports, police reports, insurance coverage documents, employment records of any nature, and banking records of any type, and to permit my attorneys to obtain a copy of such records.

I hereby authorize you to release any and all legal records concerning me, including my criminal record, probation record, juvenile record, D.Y.S. record, C.O.R.I. records, and parole records, as well as any documents relating to any legal proceeding, criminal or civil, which relates to me, to my attorneys, Carney & Bassil, and to permit them to obtain a copy of such records.

I also authorize you to discuss those records with my attorneys, as well as to relate any conversations, which you have had with me at any time. The scope of this authorization is intended to be broad and comprehensive, and is intended to constitute a waiver of all statutory and common law privileges I may possess. A photocopy of this authorization and any signature hereon shall be as valid and as effective as the original.

Date: _____

Signature _____

SSN: 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
DOB: 5-30-81